Filed 9/3/13  P. v. Palomera CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCELINO PALOMERA,<br><br>    Defendant and Appellant. | 2d Crim. No. B240338<br>(Super. Ct. No. NA090261)<br>(Los Angeles County) |

Marcelino Palomera appeals the judgment entered after a jury convicted him of assault by means likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4)), and battery with serious bodily injury (§ 243, subd. (d)).  The jury found true the allegation that appellant personally inflicted great bodily injury in committing the assault (§ 12022.7, subd. (a)).  In a bifurcated proceeding, the trial court found true allegations that appellant had suffered three prior serious or violent felony convictions that qualified as strikes (§§ 667, subds. (a) - (i), 1170.12, subds. (a) - (d)).  Appellant was sentenced to a total term of 26 years in state prison.  He contends the evidence is insufficient to support the findings that he inflicted great bodily injury in committing the assault, and serious bodily injury in committing the battery.  We affirm.

---

[1] All further undesignated statutory references are to the Penal Code.

STATEMENT OF FACTS

On August 20, 2011, video surveillance cameras recorded appellant punching Jerry Sebring in the head at the Fifth Street Metro Station in Long Beach. The video, which was played for the jury, depicts Sebring as he walked toward the edge of the platform, which is about four feet above the train tracks. When Sebring turned toward appellant and began talking to him, appellant walked over and punched Sebring in the face, knocking him off the platform and onto the train tracks below. The entire confrontation took less than 15 seconds. Sebring is then seen lying motionless on the tracks for over two minutes. Sebring was roused when a group of bystanders surrounded him. One of the bystanders appears to have told Sebring to stay down, and Sebring complied. Sebring required assistance to stand up when the paramedics arrived a few minutes later.

Sebring was placed in a neck collar, strapped to a backboard, and transported to the hospital by ambulance. Dr. Brian Fong, the emergency room physician who treated Sebring, testified that the hospital had received a call from the paramedics stating "that they were bringing a patient that was pushed over, fell off of a train platform, hit his head, lost consciousness and was a little confused at the scene." The paramedics also reported that when they arrived at the scene Sebring had a consciousness level of 14 on the Glasgow Coma Scale (GCS), which ranges from 3 (comatose) to 15 (fully alert). One point had been deducted because Sebring was "a little confused."

Sebring had improved by the time he reached the hospital and was given a GCS rating of 15. He had cuts and bruises on his shoulder and hand. He also had some amnesia about the incident, but told the doctor he believed he had been assaulted. Sebring was upset and uncooperative. Although he did not appear to be intoxicated, he refused to answer many of the hospital staff's questions and was preoccupied with finding his "marijuana stash."

Based on the report of unconsciousness, various tests were performed on Sebring including a CT scan, chest x-ray, and laboratory work. Dr. Fong explained that "[w]e did not note a lot of head trauma, however, since he did have a head injury and lost

2

consciousness, we do have patients that hit their head that do not always have a big bump or bleeding or anything like that. So we still take the head injury as serious and we do a CT scan of the brain whether or not we see a cut on the head or a big bump." The tests did not reveal any injury to Sebring's brain.[2] Sebring was discharged from the hospital with the recommendation that he come back for a follow-up visit the next day. Sebring never returned and failed to appear at trial.

Dr. Fong characterized Sebring as "a little eccentric and odd" and would not be surprised if he suffered from a mental illness. When Sebring was interviewed by the police at the hospital, he appeared to be in pain yet was cooperative. He did not manifest signs of intoxication or mental illness.

Appellant was detained about a block away from the Metro station. He told the police "that he was waiting for the train at the 5th Street train station and that he got into an argument with another patron on the platform and he became irritated and he pushed the other patron." When the officer began asking additional questions, appellant became upset and "said that he had said everything he had to say." During a subsequent police interview, appellant said that he had pushed Sebring because he thought Sebring "was about to do something." After being shown still photographs from the video recording of the incident, appellant expressed concern about going to jail and asked if the police had to pursue the matter.

Appellant testified in his own defense. According to appellant, he was sitting on a bench at the Metro station when Sebring stood in front of him and said, "You punk bitch mother fucker, I'll kill you." Sebring then walked to the edge of the platform and challenged appellant to fight. Appellant walked over and punched Sebring in the face because appellant thought Sebring was going to "do something" to him.

---

[2] Sebring was diagnosed with kidney failure and high blood pressure, although both appeared to be unrelated to the assault. Dr. Fong wanted to hospitalize Sebring due to his blood pressure, but he refused.

DISCUSSION

Appellant contends the evidence is insufficient to support the jury's true finding as to the allegation that he personally inflicted great bodily injury in committing the assault against Sebring (§ 12022.7, subd. (a)). Because "great bodily injury, as defined in section 12022.7, is an element of the crime of battery [with serious bodily injury] under section 243, subdivision (d)" (*People v. Hawkins* (1993) 15 Cal.App.4th 1373, 1376), appellant claims that his conviction of battery with serious bodily injury must also be reversed.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) Our review is the same in a prosecution primarily resting upon circumstantial evidence. We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We must accept logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise. (*Streeter*, at p. 241.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.)

The evidence is sufficient to support the jury's findings that appellant personally inflicted great bodily injury in committing the assault as contemplated in section 12022.7, subdivision (a), and that he inflicted serious bodily injury in committing the battery as provided in subdivision (d) of section 243. As appellant acknowledges, a loss of consciousness can qualify as a serious or great bodily injury. (*People v. Wade* (2012) 204 Cal.App.4th 1142, 1149 (*Wade*).) Here, the jury was presented with a video depicting the victim lying motionless on the ground for over two minutes after being knocked backward off a four-foot high platform by a punch in the face. This evidence, viewed in the light most favorable to the judgment, is sufficient by itself to support a

4

finding that the victim was rendered unconscious by the assault and battery appellant inflicted upon him. "If a picture is worth a thousand words, a moving picture is worth a million." (*People v. Webb* (1999) 74 Cal.App.4th 688, 690.) Appellant effectively concedes that the evidence of unconsciousness would be sufficient if "there was some percipient witness who was presented to the jury to discuss what he saw." He fails to appreciate, however, that the video serves as a "silent witness" that effectively "speaks for itself." (See *People v. Bowley* (1963) 59 Cal.2d 855, 860, called into doubt on other grounds in *People v. Tobias* (2001) 25 Cal.4th 327, 336-337.) Indeed, the video's "memory" of the incident is "more accurate and reliable than that of a human witness." (*Bowley,* at p. 861.)

In any event, the video is not the only evidence supporting a finding that Sebring was rendered unconscious as a result of the assault and battery. The jury also heard evidence that the paramedics who treated Sebring at the scene reported that he had lost consciousness. Although the video shows that Sebring was no longer completely unconscious when the paramedics arrived, the paramedics apparently believed they had some objective basis for reporting that he had been unconscious, whether it was their observations of his impaired mental state at the time they arrived, Sebring's own reporting of his unconsciousness, and/or the reports of percipient witnesses who actually observed Sebring while he was unconscious.

Contrary to appellant's claim, it is also of no moment that Sebring did not suffer any brain injury or identifiable head trauma. The prosecution did not have to prove Sebring suffered any actual injury, or even that he required medical treatment. (*Wade, supra*, 204 Cal.App.4th at pp. 1149-1150.) Moreover, Dr. Fong testified that Sebring *did* suffer a head injury, notwithstanding the fact that his CT scan was negative. Dr. Fong also noted that the victim had exhibited signs of amnesia, which was consistent with a finding of prior unconsciousness. This evidence, considered in conjunction with the video surveillance footage and the paramedics' report, is sufficient to support the jury's finding that appellant's actions caused Sebring to lose consciousness such that appellant

5

was guilty of inflicting great and serious bodily injury as contemplated under section 12022.7, subdivision (a), and section 243, subdivision (d).[3]

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.


---

[3] In light of our conclusion, we need not address appellant's contention that the cuts and bruises he suffered do not qualify as great or serious bodily injury.

Gary J. Ferrari, Judge

Superior Court County of Los Angeles

_____

Michael W. Flynn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.